98 N.Y.2d 373 (2002)
777 N.E.2d 204
748 N.Y.S.2d 312
THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v.
OSWALDO SANCHEZ, Appellant.
Court of Appeals of the State of New York.
Argued April 25, 2002.
Decided July 9, 2002.
*374 Reyna E. Marder, New York City, and Lynn W.L. Fahey for appellant.
*375 Charles J. Hynes, District Attorney, Brooklyn (Solomon Neubort and Leonard Joblove of counsel), for respondent.
Chief Judge KAYE and Judges WESLEY and GRAFFEO concur with Judge LEVINE; Judges SMITH and ROSENBLATT dissent and vote to reverse, reduce the conviction to manslaughter in the second degree and remit for resentencing in separate dissenting opinions; Judge CIPARICK dissents and votes to reverse and dismiss the indictment in another opinion.

OPINION OF THE COURT
LEVINE, J.
Defendant was convicted, after a jury trial, of "depraved indifference" murder (Penal Law § 125.25 [2]) for the shooting death of Timothy Range. The sole issue before us is whether the evidence was legally sufficient to support the verdict.
Range and defendant were the boyfriends of two sisters, Monon Washington and Candace Johnson. Range and Monon were together for 10 years, and their union had produced two children. The relationship between Candace and defendant existed for about a year. The occasion for their being together on the day of the fatal shooting was a party celebrating the third birthday of Candace's daughter at the family's apartment in Brooklyn, where Candace, her daughter, mother and brother Terrence resided. Range arrived at the party in the late afternoon or early evening, and defendant followed at about 9:30 P.M.
The People's case rested upon the testimony of Monon Washington and her mother, Rose Liburd. Monon testified that she and Range had a cordial relationship with Candace and defendant, and that Range and defendant got along and used to lift weights together. That evening, however, harsh words were exchanged in a hallway near the foyer entrance of the apartment when Range implied that defendant was unfaithful to Candace. From an adjoining room, Monon heard their voices raised and the sound of a scuffle, then Range telling defendant to step outside. She summoned Rose Liburd, who was the only actual eyewitness to the incident. Liburd first observed defendant walking through the entrance doorway from the hallway *376 where her two grandchildren were playing in the foyer, away from Range, who was behind the partially opened door. Then she saw defendant abruptly turn around, fire a gun pointed at Range's chest and flee. The entire incident was over in a matter of seconds. Range collapsed after phoning 911 from the kitchen. He was taken by ambulance to a hospital where he expired.
The forensic evidence was that the bullet entered Range's upper left chest, then traversed downward from front to back and left to right. It perforated Range's left lung causing the extensive internal bleeding which ultimately resulted in his death. Gunpowder residue from around the holes in Range's shirt and undershirt corresponding to the chest entrance wound indicated that the gun was fired not more than 12-18 inches from his chest.
Defendant testified that, during the confrontation described by the other witnesses, Range pulled a gun, they grappled for it and it accidentally discharged into Range's chest.
The indictment charged defendant with one count each of intentional murder (Penal Law § 125.25 [1]) and depraved indifference murder, and various weapons possession offenses. As agreed to by the defense, the court charged manslaughter in the first and second degrees as lesser-included offenses. The jury was instructed to consider no additional homicide charge in the event that it found defendant guilty of one of the murder counts. Defendant was acquitted of intentional murder but convicted of depraved indifference murder and criminal possession of a weapon in the second degree. The Appellate Division affirmed defendant's conviction.

Discussion
Under Penal Law § 125.25 (2), a person commits murder in the second degree when "[u]nder circumstances evincing a depraved indifference to human life, he [or she] recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." Defendant's challenge to the sufficiency of the evidence to sustain his conviction of depraved indifference murder is twofold. First, he argues that the People's proof was consistent only with an intentional killing and, thus, that there was no reasonable view of the evidence under which he could have been found not guilty of intentional murder and guilty of causing Range's death recklesslythe culpable mental state required under Penal Law § 125.25 (2). Second, defendant *377 contends that the record is devoid of evidence of "circumstances evincing a depraved indifference to human life" to establish that requirement of murder under Penal Law § 125.25 (2). We disagree with both contentions, and find the evidence sufficient to sustain defendant's conviction of depraved indifference murder.
Viewing the evidence in the light most favorable to the People, as we must, a rational jury could harbor a reasonable doubt that the homicide of Range was intentionali.e., that defendant's "conscious objective [was] to cause [Range's death]" (Penal Law § 15.05 [1]). The two men were friends, had engaged in activities together and socialized because of their intimate relationships with the sisters. The shooting itself appeared to have been sudden, spontaneous and not well-designed to cause imminent death. Rose Liburd testified to first seeing defendant leaving Range's presence in the hallway, then instantly reversing direction and firing the gun from behind the partly closed door separating the hallway from the entrance foyer. The victim stood behind the door.
"A: Poppy [defendant] walked out and Tim [Range] was just standing there, and no sooner than he walked out he turned right back around and came in and drew the gun. * * *
"A: His arm came around the door. When he stepped back in, his arm came around the door and he pulled the trigger. * * *
"A: He stepped off the step from the hallway into the foyer.
"Q: When you say off the step, do you mean there is a step there?
"A: Yes, there is a step right there. * * *
"A: He stepped off this step and he turned right back around and stepped back up and came with his arm through the door and shot him."
Although the gun was discharged at point-blank range, the bullet only struck Range in his upper left chest. The trajectory of the bullet through Range's body indicated that the gun was fired at an angle toward Range, a fact consistent with Rose Liburd's description of defendant's movements and Range's position behind the door. The jury may also have taken into account *378 the preexisting good relations between defendant and Range, and concluded that this was an instantaneous, impulsive shootingperhaps to disable or frighten Range, rather than to kill him. Thus, a jury reasonably could have found that defendant's homicidal level of mental culpability was reckless rather than intentional.
It is noteworthy that defendant agreed that the court would charge manslaughter in the second degree as a lesser-included offensein effect conceding that there was a "reasonable view of the evidence which would support a finding that the defendant committed [reckless homicide] but did not commit [intentional murder]" (CPL 300.50 [1]). Had the jury convicted defendant of the reckless homicide of manslaughter in the second degree, he would have been precluded from making the argument he makes here, that the People's proof was only consistent with intentional murder (see id.; People v Borst, 232 AD2d 727, 728 [3d Dept 1996], lv denied 89 NY2d 940 [1997]; see also People v Ford, 62 NY2d 275, 283 [1984]).
Alternatively, defendant argues, and one of our dissenting colleagues agrees, that there was no reasonable view of the evidence to support a finding that defendant acted under circumstances evincing a depraved indifference to human life. We are unpersuaded. To the contrary, accepting the jury's determination that the killing of Range was not intentional (see supra), defendant's shooting into the victim's torso at point-blank range presented such a transcendent risk of causing his death that it readily meets the level of manifested depravity needed to establish murder under Penal Law § 125.25 (2). Here, once it rejected intentional murder, the jury (which concededly was properly instructed) could reasonably conclude that defendant's conduct was so manifestly destined to result in Range's death as to deserve the same societal condemnation as purposeful homicide (see People v Register, 60 NY2d 270, 274 [1983], cert denied 466 US 953 [1984]; 2 Encyclopedia of Crime and Justice, at 858 [1983] [in "general, the distinguishing feature of the (modern definitions of murder) is an intent to kill or a disregard of so plain a risk of death to another that it is treated as the equivalent of an intent to kill"] [emphasis supplied]).
Judge Rosenblatt concludes, however, that even the highest level of risk from the perpetrator's conductmaking death all but inevitablewould be insufficient alone, because the "unchanging core requirement" of depraved indifference murder is proof of an additional mens rea element to recklessness, that is, the defendant's "uncommonly evil and morally perverse *379 frame of mind" (Rosenblatt, J., dissenting, 98 NY2d at 396). Requiring not only extreme risk but also an unusually evil mental state is necessary, Judge Rosenblatt says, in order to prevent the merger of intentional and depraved indifference murders (see Rosenblatt, J., dissenting, 98 NY2d at 403-404).
Such a requirement is not consistent with our precedents in construing and applying the lead-in phrase "under circumstances evincing a depraved indifference to human life" in the definition of reckless murder under the revised Penal Law of 1967. The meaning of the phrase was directly debated in People v Register. There, the proof was that defendant arrived at a crowded bar room with a loaded handgun, drank continuously for four hours and announced several times that he was "going to kill somebody tonight" (60 NY2d at 275). After his companion got into an argument with another patron named Mitchell, defendant fired at Mitchell but missed, striking another patron. He then shot Mitchell in the stomach at close range, injuring but not killing him, and turned and fired at yet a third patron, resulting in that person's death.
The issue before the Court in Register was whether the defendant's intoxication could negate the demonstration of depraved indifference to human life elevating the homicide from manslaughter to murder. The dissenters in Register construed the phrase as referring to a mens rea element additional to recklessness. Hence, they concluded that the jury should have been instructed to consider whether defendant was so drunk as to be incapable of consciously being indifferent to the risks his conduct entailed. The Register majority, however, focused on the first words of the phrase, referring to "circumstances evincing" depraved indifference, and concluded that
"[t]his additional requirement refers to neither the mens rea nor the actus reus. If it states an element of the crime at all, it is not an element in the traditional sense but rather a definition of the factual setting in which the risk creating conduct must occurobjective circumstances which are not subject to being negatived by evidence of defendant's intoxication" (id. at 276 [emphasis supplied]).
Thus, the Register majority explained that the requirement of circumstances evincing a depraved indifference to human life under Penal Law § 125.25 (2) murder focuses not on the subjective intent of the defendant, "but rather upon an *380 objective assessment of the degree of risk presented by defendant's reckless conduct" (id. at 277 [citations omitted]). As Register instructs, objective circumstances of exceptionally high, unjustified risk of death constitute the primary means by which the Legislature differentiated between the reckless state of mind sufficient to establish the mental culpability of manslaughter and the extreme recklessness of murder under Penal Law § 125.25 (2).
Contrary to the repeated assertions of Judge Rosenblatt's dissent, the majority writing in Register does not hold that "ordinary recklessness" is sufficient to establish depraved indifference murder (see Rosenblatt, J., dissenting, 98 NY2d at 397, 398, 400, 408, 412). Register requires a significantly heightened recklessness, distinguishing it from manslaughter in two ways. First, "in a depraved mind murder the actor's conduct must present a grave risk of death whereas in manslaughter it presents the lesser substantial risk of death" (60 NY2d at 276). Then, it also requires proof of circumstances manifesting a depraved indifference to human life, focusing the inquiry, as we have seen, "upon an objective assessment of the degree of risk" which "converts the substantial risk present in manslaughter into a very substantial risk" (id. at 277 [emphasis in original]). Thus, Register concludes, extreme recklessnessthe conscious disregard of circumstances revealing the exceptional risk of death from the defendant's conductwas the predominant means chosen by the Legislature to distinguish murder under Penal Law § 125.25 (2) from manslaughter and make it equivalent in grade to intentional murder:
"In sum, the statutory requirement that the homicide result from conduct evincing a depraved indifference to human life is a legislative attempt to qualitatively measure egregiously reckless conduct and to differentiate it from manslaughter" (id. at 279 [emphasis supplied]).
Later cases have consistently followed and by now have made settled law of Register's conclusion that the crux of murder under Penal Law § 125.25 (2) is recklessness exaggerated by indifference to the circumstances objectively demonstrating the enormity of the risk of death from the defendant's conduct. We repeated verbatim the Register interpretation of the opening phrase of the statute in People v Gomez (65 NY2d 9, 11 [1985] ["circumstances evincing a depraved indifference * * * involves `an objective assessment of the degree of risk presented by *381 defendant's reckless conduct'"]) and in People v Roe (74 NY2d 20, 24 [1989] [same]). Judge Rosenblatt would have us overrule Register and adopt the position of the dissenters in that case (see Rosenblatt, J., dissenting, 98 NY2d at 397-398, 415).
There may, of course, be other circumstances manifesting depravityincluding the brutal, barbaric or savage nature of a defendant's reckless conductas relied upon in the dissents. That would be especially relevant where the risk of death merely meets the statutory threshold of being grave. These, however, are only "collateral to the basic proposition of known risk" of death (Gegan, A Case of Depraved Mind Murder, 49 St John's L Rev 417, 450 [1974]). They are not necessary when the risk of death is manifestly extreme and unjustified. Then, a defendant's disregard of the risk elevates and magnifies the degree of recklessness, itself establishing the required circumstances evincing depraved indifference to human life. People v Roe, a Russian roulette case, perfectly illustrates that reckless disregard of an unjustified extreme risk of causing death can establish the necessary manifestation of depravity, without proof that the defendant's state of mind was also in some way "uncommonly evil." Roe would also have to be overruled if the dissenters are correct here.
Register's focus on an objective assessment of an exceedingly high degree of risk that the defendant created and ignored, which differentiates reckless murder from reckless manslaughter, is completely consistent with the English common law antecedents of depraved mind murder, as well as with modern criminal law theory. At common law, a homicide with "malice aforethought" was murder, and included not only intentional and felony murders but a killing resulting from extremely reckless conduct (see 2 Encyclopedia of Crime and Justice, at 859). "`[M]alice' was `implied' when the act was so reckless as to evince a `heart regardless of social duty and fatally bent on mischief'" (Wechsler and Michael, A Rationale of the Law of Homicide: I, 37 Colum L Rev 701, 703 [1937]). Reckless murder was distinguished from manslaughter "by the relatively greater danger of the act and the consequently greater indifference to the safety of others manifested by it" (id. at 709-710 [emphasis supplied]).
Modern scholarship on the law of homicide is also consistent with Register and its progeny regarding reckless murder. W.R. LaFave and A.W. Scott, Jr. posit a continuum of risks from homicidal behavior, forming the basis to distinguish lower grades of homicide from murder (2 LaFave and Scott, Substantive Criminal Law § 7.4, at 200):

*382 "Grossly negligent conduct, or reckless conduct, which results in death may serve as the basis for manslaughter liability, but it will not do for murder.
"For murder the degree of risk of death * * * must be more than a mere unreasonable risk, more even than a high degree of risk. Perhaps the required danger may be designated a `very high degree' of risk to distinguish it from those lesser degrees of risk which will suffice for other crimes."[1]
The American Law Institute's Model Penal Code is especially instructive. Our Penal Law Revision Commission, having drafted and proposed the 1967 revised Penal Law, acknowledged its special debt to the Model Code, pointing out that the Code's chief reporter, Professor Herbert Wechsler, was also a member of the Commission (see NY St Temp Commn on Revision of Penal Law and Criminal Code, Proposed NY Penal Law, Commission Foreword, at V-VI [1964]). The Model Penal Code's version of reckless murder is a homicide "committed recklessly under circumstances manifesting extreme indifference to the value of human life" (Model Penal Code § 210.2 [1] [b] [1980]).[2]
As the commentary to the Model Penal Code explains, the culpability for non-intentional murder is extreme recklessnessi.e., the disregard of such a high degree of risk created by the actor's conduct that it "cannot fairly be distinguished in grading terms from homicides committed purposely or knowingly" (Model Penal Code § 210.2, Comment 4, at 21). That is because
"purposeful or knowing homicide demonstrates precisely such indifference to the value of human life. Whether recklessness is so extreme that it demonstrates similar indifference is not a question, it is submitted, that can be further clarified. It must be left directly to the trier of fact under instructions which make it clear that recklessness that can fairly be assimilated to purpose or knowledge *383 should be treated as murder and that less extreme recklessness should be punished as manslaughter" (id. at 22).
Nowhere in these modern formulations of depraved mind or depraved indifference murder is there a requirement that, in addition to the extremely reckless nature of the homicidal conduct, there must also be proof in some other sense of an "uncommonly evil and morally perverse frame of mind" (Rosenblatt, J., dissenting, 98 NY2d at 396), in order to distinguish the crime from intentional murder or manslaughter.[3] Indeed, not once in any of these texts is there a hint of agreement with the dissents here and in Register that the depraved or extreme indifference standard imposes an evil mind mens rea additional to "egregious" recklessness.
We disagree with Judge Rosenblatt's suggestion that Darry v People (10 NY 120 [1854]) continues to provide the bedrock of our reckless murder jurisprudence. The previous discussion demonstrates that our contemporary statutory and decisional law of that form of murder leaves Darry far behind. In Darry, the defendant was convicted of depraved mind murder of his wife, for inflicting severe blows to her head and stomach with his fist and a chair over a sustained period of three days, resulting in her death. The Darry majority's apprehension that an affirmance would obliterate the distinction between "depraved mind" murder and manslaughter (see 10 NY at 148)not the distinction between such murder and intentional murder caused it to impose two substantive requirements in addition to extreme recklessness, neither of which was mandated at common law (see Gegan, A Case of Depraved Mind Murder, 49 St John's L Rev at 427-431), and neither of which even arguably applies today. They were that the conduct causing death must be "aimed at no one in particular" and must "endanger[] indiscriminately the lives of many" (Darry, 10 NY at 146). Both are entirely obsolete under the current statute. The first requirement, that the reckless conduct must not be directed at a particular person, was effectively removed, at least as early as People v Kibbe (35 NY2d 407 [1974]). The second requirement was summarily declared dead in People v Poplis (30 NY2d *384 85, 89 [1972]) as having been "subsequently corrected by amendment." Poplis itself is distinguishable from Darry only in that the Poplis victim was the defendant's stepchild rather than his wife, a distinction without a substantive difference. Undisputably, today, Darry's conviction would be affirmed.
Thus, the properly framed issue before us is whether, on this record, based on an objective assessment of the risk defendant recklessly created and disregarded, the likelihood of causing death from defendant's conduct was so obviously severe that it evinced a depraved indifference to human life. Surely, pointing a gun at Range, without the slightest justification, discharging it within not more than 18 inches of his body and striking him in the chest, would permit a jury rationally to conclude that defendant demonstrated an indifference to human life so depraved as to be deserving of the same punishment as intentional murder; that it was virtually a knowing, although not intentional, homicide.[4] Defendant's disregard of such an exceedingly high likelihood that his conduct would result in Range's death distinguishes his culpability from the degree of recklessness needed to establish the mental element of second degree manslaughter.
That his conduct involved such a high risk of death that it could also lead to the conclusion that it was intentional supports rather than detracts from characterizing it as evincing depraved indifference to human life. As the commentary to the Model Penal Code cogently points out, purposeful homicide itself is the ultimate manifestation of indifference to the value of human life.
Nevertheless, the two murder crimes are by definition clearly distinguishable with respect to their differing mental states, and the Register formulation of depraved indifference murder does not at all blur that distinction. Adding further mens rea elements or substantive requirements of subjectively defined characteristics of the defendant's acts will only confuse rather than clarify. Juries properly instructed are capable of making the distinction between the two crimes. The appropriate judicial safeguard against any such merger is the traditional one provided by statute and decisional law, employed herean *385 examination of the record to determine whether there is any reasonable view of the evidence which would permit a jury rationally to acquit of intentional murder and convict of depraved indifference murder. Neither the defendant nor the dissenters have demonstrated its inadequacy.[5]
As this case demonstrates, the trial court was well aware of the law on depraved indifference murderthis is not a new invention since Register. Further, this jury was instructed both as to the severity and the gradations of the crime. Clearly, there was no "unfairness" as to this defendant (see Rosenblatt, J., dissenting, 98 NY2d at 406). The court explained to the jury that generally reckless criminal conduct is regarded "less serious and blameworthy than a crime committed intentionally, but when reckless conduct is engaged in under circumstances evincing a depraved indifference to human life, the law regards that conduct as so serious, so egregious, as to be the equivalent of intentional conduct."
Moreover, on the facts presented here, viewed in a light most favorable to the People, there is a valid line of reasoning by which the jury could have found defendant guilty of depraved indifference murder. The firing of a loaded gun in an enclosed space within 18 inches of another person was undoubtedly imminently dangerous and presented a grave risk of death. We are persuaded, moreover, that defendant, like the close-range shooter in Roe, acted in objective circumstances manifesting depraved indifference. Defendant felt insulted by his victim, a person known to him; they were both celebrating the birthday of the three-year-old daughter of defendant's paramour. *386 Instead of amicably settling their dispute, defendantwith at least one other person (the eyewitness) in the hallway spontaneously turned, his arm came from around the door, he pointed the gun in the direction of the victim who was standing behind the door, and he pulled the trigger. The bullet hit the victim in the left upper chest and moved in a downward trajectory. Defendant fled. On these facts, the jury could reasonably have concluded that defendant's conduct was either reckless and depraved, or intentional. The jury chose the former, and, as there is evidence in the record to support that determination, we must uphold it.
For all of the foregoing reasons, the order of the Appellate Division should be affirmed.

*387 Appendix

 NYS INDICTMENTS CONTAINING PL 125.25(01) AND P 125.25(02) COUNTS (1989-2001)
 ONVICTED
 OTHER CONVICTED
 INDICTED CONVICTED ARTICLE 125 NON-ARTICLE ACQUITTED
 125.25 CONVICTED CONVICTED 125.25 OTHER OFFENSE 125 OFFENSE ALL DISPOSED NOT
YEAR (01) & (02) 125.25 (01) 125.25 (02) SUBSECTION ONLY ONLY CHARGES OTHER DISPOSED
1989 183 50 20 1 77 5 7 10 13
1990 251 48 25 1 99 11 19 37 10
1991 191 41 16 2 76 9 17 16 10
1992 257 64 32 4 85 14 15 30 18
1993 348 89 29 6 114 24 27 46 11
1994 427 131 42 3 130 37 29 31 27
1995 381 128 40 8 104 19 29 32 22
1996 385 118 35 8 102 28 24 51 13
1997 365 93 33 7 128 27 26 28 20
1998 356 96 38 6 95 34 40 23 26
1999 360 93 28 5 89 27 20 31 65
2000 360 78 24 4 91 14 16 18 116
2001 373 21 7 1 27 3 2 9 302

(Source, Division of Criminal Jus ice Services, Indictment Statistical System, June 2002. Numbers for 2001 should be considered preliminary.)
*388 SMITH, J. (dissenting).
This case illustrates the problems attendant to using a charge of depraved indifference as a proxy for intentional murder. Defendant was indicted on charges of intentional murder (Penal Law § 125.25 [1]) and depraved indifference murder (Penal Law § 125.25 [2]). While defendant was acquitted of intentional murder and convicted of depraved indifference murder, the trial evidence is insufficient to establish that conviction. Because of the lack of evidence, the conviction should be reduced to manslaughter in the second degree, the lesser included offense of depraved indifference murder. I, therefore, dissent.
The events of July 31, 1998 can reasonably be understood to support a conviction of intent to commit murder or intent to inflict serious bodily injury resulting in death.
On July 31, 1998, defendant was attending a birthday party at the home of his girlfriend, Candace Johnson. Three other adults were also in attendance, including Candace's mother, Rose Liburd (Liburd), her brother, Terrence Johnson, and her sister, Monon Washington (Washington). All of these family members were in the house when Washington's boyfriend, Timothy Range (Range), arrived. Three children were also present in the home.
Just inside the front door, there is a vestibule. A glass door separates the vestibule from the rest of the house. If one faces that vestibule door, the rooms of the house are situated in a line on the right going backthe front room, bedroom, dining room and kitchen. A hallway of approximately 15 feet runs the length of the house and is situated to the left of the row of rooms. Two more bedrooms and a bathroom are located in the back of the downstairs area. The shooting took place at the vestibule door, at one end of the 15-foot hallway. The witness viewed the shooting from the other end of the hallway.
Washington testified that while she was sitting in the front room of the house, she observed through a window Candace greet Range and the two proceed into the house. She testified further that she heard Range accuse defendant of cheating on Candace by "talking to a girl on Church Avenue." She heard some sort of scuffle, the sound of something hitting the door and Range tell defendant to step outside. Washington testified that she told Liburd that defendant and Range were about to fight, and Liburd left the dining room, running to the hallway.
Liburd testified that she heard Range arrive and move down the hall toward the back bedroom. Fifteen minutes later, *389 Liburd heard voices. The people were speaking in normal tones, although Liburd could not hear what they were saying. When Liburd was told that Range and defendant were about to fight, she went into the hallway. Range "was standing down the hall behind the door (to the vestibule)." The door was partially open and Range was against the wall. She saw defendant walk out of the door from the hallway. Liburd described the shooting in this manner:
"Q. And what happened after you saw Poppy [defendant] walking out?
"A. Poppy walked out and Tim [Range] was just standing there, and no sooner than he walked out he turned right back around and came in and drew the gun.
"Q. And what did he do?
"A. He drew the gun and he shot Tim and he ran."
Liburd testified further that there was no fighting between the two men.
Defendant presented an entirely different set of facts to support a justification defense. He testified that upon arriving, he met Candace. He walked to the back room, greeted Terrence and attempted to greet Range, who had a mean look on his face. Range told defendant that he heard something about defendant and demanded that they talk outside. Defendant followed Range to the front hallway.
Defendant testified that he was afraid as he walked down the hall. Defendant stopped by the door, and Range got right in his face and told defendant, "I should kill you for the bullshit that you did." Defendant stated that Range suddenly lifted his shirt and pulled out a gun. Because Range was so close to him, defendant feared that he would be shot in the back. Defendant grabbed Range's hand, which was on the gun, and turned his wrist away. Range pushed defendant against the wall, and the two struggled. Defendant's hand was wrapped around Range's, and Range's hand was on the trigger. The gun was facing Range when it went off. Defendant then fled.
A forensic scientist, Dr. Beverley Leffers, testified that the cause of death was a gunshot to the chest which perforated the lung. She testified that she examined the tee shirt that Range had been wearing and found a black deposit consistent with gun powder, which indicated that the gun was held at close range, no more than 12 to 18 inches away.
*390 The court submitted charges for intentional murder and depraved indifference murder, to be considered in the alternative. The court also submitted intentional and reckless manslaughter as lesser included offenses of the respective murder counts. These lesser charges were to be considered only if the defendant was found not guilty of intentional murder and depraved indifference murder. Defendant objected to the charge for depraved indifference murder, arguing as follows:
"I see there is no reasonable view of the evidence to indicate that that should be charged. There is nothing to indicate in this record that defendant at any time acted in a depraved manner, which would require him to do some thinking about it, and recklessly, which would reach that particular point where murder in the second degree reckless and depraved should be charged."
In support of the depraved indifference murder charge, the People argued that defendant's act could be considered reckless because "he fired the gun a few feet from two small children." The court specifically stated that the depraved indifference murder count did not go to the small children, but nonetheless denied defendant's motion to dismiss that count, observing, "some people can conclude from the record that pointing a loaded gun at someone and pulling the trigger at point blank range within 18 inches is depraved, as well as intentional."
The jury found defendant not guilty of intentional murder but guilty of depraved indifference murder. Prior to sentencing, defendant made a CPL 330.30 (1) motion to set aside the verdict, arguing that the evidence was legally insufficient to establish depraved indifference murder. Supreme Court denied the motion, and the Appellate Division affirmed.
That the Legislature sought to distinguish intentional killings from non-intentional killings is obvious from the statutory language. A person is guilty of intentional murder in the second degree when "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person" (Penal Law § 125.25 [1]). A person acts "intentionally" with respect to a result "when his conscious objective is to cause such result" (Penal Law § 15.05 [1]). By contrast, a person is guilty of depraved indifference murder in the second degree, when "[u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a *391 grave risk of death to another person, and thereby causes the death of another person" (Penal Law § 125.25 [2]). A person acts "recklessly" with respect to a result "when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur" (Penal Law § 15.05 [3]).
Depraved indifference murder is not a substitute for intentional murder. A finding of depraved indifference murder should be based on evidence that the defendant killed another under circumstances which demonstrate a wanton disregard of human life or a depravity of mind (People v Register, 60 NY2d 270, 274, 279 [1983]). In other words, defendant must have indulged in highly reckless behavior, indeed gravely risky behavior, but it is behavior that falls short of a certainty of death or serious injury. Intentional behavior, by contrast, requires that defendant subjectively intend to commit murder.
The defendant in Register drank heavily throughout the day and went to a crowded bar, taking a loaded gun. After an argument with one patron over money owed, defendant produced his gun. The dispute ended, and defendant continued to drink for another four hours. After midnight, another argument began between defendant and one Willie Mitchell. Defendant fired his gun, but missed Mitchell and injured a third person, who had intervened to stop the fight. Defendant then stepped forward and shot at Mitchell at close range. At that time, some 40 or 50 patrons started for the door. When bystanders tried to remove Mitchell to a hospital, a second victim walked by defendant, and defendant fatally shot this second person.
Defendant was tried for both intentional and depraved indifference murder. In rejecting the defense of intoxication to negate culpability for depraved murder, the Court emphasized that the applicable mens rea of depraved mind murder was recklessness. Depraved indifference murder "refers to neither the mens rea nor the actus reus. If it states an element of the crime at all, it is not an element in the traditional sense but rather a definition of the factual setting in which the risk creating conduct must occurobjective circumstances which are not subject to being negatived by evidence of defendant's intoxication" (id. at 276). The Court examined the statutory development of the crime and noted that the Legislature sought to structure the degree of risk which must be present in non-intentional killings by "providing that in a depraved mind murder the actor's conduct must present a grave risk of death whereas in manslaughter it presents the lesser substantial risk of death * * *. The phrase `[u]nder circumstances evincing *392 a depraved indifference to human life' refers to the wantonness of defendant's conduct and converts the substantial risk present in manslaughter into a very substantial risk present in murder * * *" (id. at 276-277 [citations and quotation marks omitted] [emphasis in original]). "[T]he focus of the offense is not upon the subjective intent of the defendant, as it is with intentional murder * * * but rather upon an objective assessment of the degree of risk presented by defendant's reckless conduct * * *" (id. at 277).
Thus, in Register, the "objective circumstances" evincing a grave risk of death were to be found in defendant's getting drunk, carrying a loaded gun and shooting it three times in a crowded public place, a setting where the risk of danger to people was very substantial. The "objective circumstances" reveal the peril to which defendant subjected everyone in that bar.
We have found depraved indifference where the defendant indulged in behavior evidencing a grave risk of death, but again it is behavior that falls short of a certainty of death. In People v Roe (74 NY2d 20 [1989]), this Court, citing Register, reasoned that depraved indifference to human life is assessed "based on an objective assessment of the circumstances surrounding the act * * * and not the mens rea of the actor" (id. at 27). We found "objective circumstances" sufficient to support a finding of depraved indifference to human life where the defendant, with knowledge of weapons, deliberately loaded a mix of "live" and "dummy" shells at random into the magazine of a 12-gauge shotgun, pumped a shell into the firing chamber not knowing whether it was a "dummy" or a "live" round, raised the shotgun, pointed it directly at the victim and pulled the trigger (see People v Russell, 91 NY2d 280 [1998] [affirming depraved indifference murder where defendants fired high-powered guns capable of shooting bullets at an average rate of 1,100 feet per second across a pedestrian thoroughfare, and a stray bullet hit bystander]; People v Gomez, 65 NY2d 9 [1985] [affirming conviction for depraved indifference murder where person drove at a speed of 40 miles per hour down a busy sidewalk without attempting to put on the brakes and killed two people]; People v Fenner, 61 NY2d 971 [1984] [applying rationale of Register, and concluding that the number of shots fired, the number of persons fired at and the fact that they were running toward the door of the poolroom in an effort to get away from the defendant were circumstances sufficient to present a question for the jury as to depraved indifference]; People v Kibbe, 35 NY2d *393 407 [1974] [finding factual circumstances sufficient to establish depraved indifference where defendants robbed victim, took his glasses, pulled his pants down around his ankles, pulled his shirt above his waist and abandoned him on a two lane highway in near zero temperature weather]; People v Poplis, 30 NY2d 85 [1972] [finding depraved indifference to human life where defendant brutally beat a child over a five-day period]).
There is, however, a point at which the risk of death or risk of serious bodily injury approaches a certainty, and it defies logic to charge or to make a finding of depraved indifference. Such a case is presently before us.
We are obliged to view the evidence in the light most favorable to the People, bearing in mind that credibility is a matter to be determined by the trier of fact (see People v Malizia, 62 NY2d 755, 757 [1984]). The People contended that defendant was stepping out of the front door, that he turned around, came back through the door, aimed his gun at the victim and shot him at close range, from between 12 and 18 inches away. Thus, the evidence reasonably supported a charge that the defendant intended to kill the victim or intended to cause serious bodily injury to the victim. The evidence did not support a charge of depraved indifference murder because the risk of death or serious bodily injury from a shot at that close range was a certainty and not merely a "grave risk" (see Register, 60 NY2d 270 [grave risk where defendant shot three times in a crowded bar]; People v Roe, 74 NY2d 20 [grave risk where defendant randomly mixed live and dummy ammunition in a shotgun in a game of Russian Roulette]; see also People v Magliato, 110 AD2d 266, 270 [1985], affd 68 NY2d 24 [1986] [conviction for depraved indifference reduced to manslaughter in the second degree where conduct was not wanton, gross or callous indifference to human life where defendant aimed gun at victim from 45 feet away and testified that gun discharged accidently when he was startled]). To uphold the conviction of depraved indifference murder in this case is to authorize the substitution of depraved indifference murder for intentional murder at any time that a person shoots and kills another.
Because the jury did not consider the lesser included offenses of first and second degree manslaughter (People v Johnson, 87 NY2d 357, 361 [1996] [where inconsistent counts, jury should consider top counts before considering the lesser included of either count]), and because the jury's acquittal of intentional murder and finding of guilt as to depraved indifference murder raise double jeopardy issues as to any retrial on *394 the manslaughter first degree charge, the only remedy is to reduce the conviction to manslaughter in the second degree and remand to the trial court for re-sentencing.
ROSENBLATT, J. (dissenting).
I agree with Judge Smith's conclusion but write separately to emphasize my concern over the way in which the concept of depraved indifference murder has been increasingly expanded. By asking us to affirm this conviction, the People would have us extend the concept even further. In my view, any additional enlargement of depraved indifference murder is unwarranted and incompatible with the Legislature's carefully drawn gradations for homicide.
Depraved indifference murder is characterized by "extremely dangerous and fatal conduct performed without specific homicidal intent but with a depraved kind of wantonness: for example, shooting into a crowd, placing a time bomb in a public place, or opening the door of the lions' cage in the zoo" (Denzer and McQuillan, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law § 125.25, at 235 [1967]). To be guilty of depraved indifference murder, the defendant must evince more than mere indifference to human life. The indifference must be so extremeso wicked and mischievousas to constitute a depraved indifference. That inhuman frame of mind is what equates the crime's blameworthiness with intentional murder.
In my view Judge Smith correctly points out that an affirmance here would allow depraved indifference murder to serve as a proxy for intentional murder whenever a person shoots and kills another (dissenting op at 393 [Smith, J.]). Put differently, by holding the facts at hand sufficient to establish depraved indifference murder, the majority leaves no conceivable circumstances under which a charge of intentional murder will not be amenable to a conviction for depraved indifference murder. Undeniably, the two crimesintentional murder and depraved indifference murderare now merged, fully and inseparably. Moreover, to the extent it endorses People v Register (60 NY2d 270 [1983], cert denied 466 US 953 [1984]), the majority also conflates depraved indifference murder with reckless manslaughter. These mergers are out of line with the history of depraved indifference murder, the statute's purpose and its unique place in the legislative design.

I. The Crime's Historical Development
Depraved indifference murder goes back to the common law. As recounted in Darry v People (10 NY 120 [1854]), a person *395 who took someone's life while evincing a "general malice or depraved inclination to mischief, fall where it may" was guilty of murder (id. at 143). From the earliest stages of its development, the crime was reserved for those "cases of depraved and reckless conduct, aimed at no one in particular, but endangering indiscriminately the lives of many, and resulting in the death of one or more" (id. at 146). The Darry Court, in noting that its interpretation of the New York homicide statute[1] was rooted in these common-law principles (see id. at 141-143), described examples of depravity such as willfully riding an "unruly horse" among a crowd of persons[2] or with reckless indifference shooting a gun into a house with people inside (see id. at 146).
Seventy years later, in People v Jernatowski (238 NY 188 [1924]), we interpreted a successor statute (former Penal Law § 1044)[3] almost identical to the one in Darry. Jernatowski fired multiple shots into a house knowing that people were inside, and killed one of them. Describing the defendant's conduct as "barbarous and depraved" (id. at 193), the Court concluded that a jury could properly determine that a person who "fired two or more shots into the house where he knew there were human beings * * * evinced a wicked and depraved mind regardless of human life" (id. at 192). In affirming the conviction for depraved mind murder (as it was then called), the Court focused on the barbaric nature of the defendant's conduct and his utter disregard for the dangerous consequences of that conduct.
*396 In its 1967 recodification, the Legislature replaced Penal Law § 1044 with Penal Law § 125.25 (2).[4] The new statute, at issue on this appeal, changed "depraved mind" to "depraved indifference to human life" (Penal Law § 125.25 [2]). The concept, however, remained the same. Indeed, the Temporary State Commission on Revision of the Penal Law and Criminal Code expressly noted that the new statute was "substantially a restatement" of the former statute.[5] Thus, contrary to the majority's assertion that the 1967 recodification left Darry and its progeny "far behind" (majority op at 383), the Legislature's clear intent was merely to restate the law, not to abrogate this State's decisional law on the requisite mens rea for depraved indifference murder. In the wake of its 1967 restatement, the Legislature continued to contemplate a mental state so morally perverse, and so indifferent to the consequences to human life, as to be considered depraved.
People v Poplis (30 NY2d 85 [1972]) was our first opportunity to pass on Penal Law § 125.25 (2). The defendant killed a three-year-old child by beating him repeatedly over a five-day period. Arguing that his actions did not fall within the depraved indifference murder statute, Poplis contended that there was no meaningful difference between depraved indifference murder and reckless manslaughter. The Court rejected his argument, pointing out that depraved indifference murder contemplates conduct that is more than reckless: it envisions actions so extreme as to be "brutal, callous and inhuman" (Poplis, 30 NY2d at 87). In reaching this conclusion (and maintaining the depravity standard), we drew on Jernatowski and Darry. Although those cases dealt with the threat of danger to more than one person,[6] they stressed the unchanging core requirement that the killer exhibit such utter indifference to human life as to constitute depravitythat the killing, although not intentional, reflects the defendant's uncommonly evil and morally perverse frame of mind. Often, but not necessarily, this *397 state of mind is revealed by the brutal or savage nature of the crime.[7]

II. People v Register

People v Register (60 NY2d 270) marked a turning point in the Court's analysis. There we addressed depraved indifference murder but dealt principally with the question whether the trial court erred in refusing to consider intoxication as a defense to depraved indifference murder. In affirming Register's depraved indifference murder conviction, the Court, for the first time, held that the requisite mens rea for that crime was ordinary recklessnessthe exact same mental state required for manslaughter in the second degree.[8] Moreover, the Court determined that the statutory phrase "[u]nder circumstances evincing a depraved indifference" referred not to the defendant's mental state but the objective circumstances surrounding the criminal act. In depraved indifference murder cases, the focus, stated the Court, is on the "assessment of the degree of risk presented by defendant's reckless conduct" (id. at 277). *398 The Court went on to hold that because intoxication evidence should be excluded whenever recklessness is an element of the crime, the trial court's refusal was proper.
In dissent, Judge Jasen (joined by Chief Judge Cooke and Judge Meyer) arguedcompellingly to my mindthat the mens rea element of depraved indifference murder is depraved indifference and not, as the majority concluded, mere recklessness. The dissenters pointed out that ever since the crime of depraved indifference murder was codified under the Revised Statutes of 1829, the culpable mental state had been depravitya mental state far more egregious than ordinary recklessness (see id. at 285-286). In the Register dissenters' view, there existed no reason to depart from a point of law that had been settled for 130 years, particularly where the Legislature, by its 1967 recodification, intended no such departure (see id. at 281-282).
Register dealt chiefly with the defense of intoxication, but ironically, the case has served as the fulcrum for what has become a steadily growing prosecutorial practice of charging defendants with depraved indifference murder as a companion count to intentional murder. The Register majority brushed aside the dissenters' prediction that the decision would "result in wholesale depraved mind murder prosecutions for what are essentially intentional murders" (id. at 279). That prediction proved prescient, however, as revealed by the enormous growth in depraved indifference murder companion counts post-Register.

III. The Development of Depraved Indifference Murder in the Aftermath of People v Register

After deciding Register, this Court considered several depraved indifference murder cases. None has gone so far as to justify a conviction for depraved indifference murder in a shooting of the type before us.
In People v Gomez (65 NY2d 9 [1985]), the defendant deliberately drove his automobile at 40 miles per hour down a busy sidewalk, striking several people and killing two. We affirmed the conviction for depraved indifference murder, concluding that "[t]he risks posed by defendant's conduct in this case and his callous indifference to them entitled the jury to conclude that his conduct placed the crime on the same level as intentional murder" (id. at 12).
In People v Roe (74 NY2d 20 [1989]), the Court affirmed a conviction for depraved indifference murder where the defendant, *399 a 15-year-old high school student, deliberately loaded a mix of "live" and "dummy" shells into the magazine of a 12-gauge shotgun and fired the weapon at the victim, who was standing only 10 feet away. Over a vigorous dissent, the Court concluded that the evidence was legally sufficient to support the conviction (id. at 28).[9]
We have also affirmed depraved indifference murder convictions in cases where the defendant fired several shots at a number of people (see People v Fenner, 61 NY2d 971 [1984]), where the defendant brutally beat a child (see People v Bryce, 88 NY2d 124 [1996]; People v Cole, 85 NY2d 990 [1995]; People v Best, 85 NY2d 826 [1995]), and where the defendant killed six patients by injecting them with a neuromuscular blocking agent (see People v Angelo, 88 NY2d 217 [1996]). Finally, in People v Russell (91 NY2d 280 [1998]), we affirmed a conviction for depraved indifference murder where the defendant, along with other participants, engaged in a gun battle that resulted in the death of an innocent bystander who was struck by a stray bullet.[10]
Even though we have allowed more and more cases to fall within the definition of depraved indifference murder, our language in Russell remains cogent and relevant. "To constitute depraved indifference, conduct must be so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a *400 person who intentionally causes the death of another" (id. at 287-288 [internal quotation marks omitted] [emphasis added]).
This formulation, which is consistent with the criteria codified in 1829 and articulated in Darry, focuses on the defendant's depravitya mental state so appalling that we ascribe to it a moral deficiency tantamount to barbarity. Thus, in centering the analysis on the defendant's moral deficiency, Russell correctly deals with the mens rea, and not the "objective circumstances." Russell articulates a mens rea requirement far more culpable than mere recklessness, which simply requires a conscious disregard of a substantial risk. The Russell Court's formulation of depraved indifference murder requires a state of mind so wanton, so morally deficient and so blameworthy as to place that crime on a par with intentional murder. This obviously goes beyond mere recklessness, which, in the homicide classifications, is two grades lower.[11] Indeed, Russell cites People v Fenner (61 NY2d 971), which held that depraved indifference murder is characterized by "conduct, beyond being reckless * * * [which is] so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes the death of another" (id. at 973 [emphasis added]). Reckless conduct (the Register standard) is obviously not the same as conduct that goes beyond recklessness (the Russell standard). In making that critical distinction, the Court in Russell and Fenner improved on Register by properly identifying the heightened mens rea requirement that characterizes depraved indifference murder.
Until Register was decided, this heightened standard, which forcefully articulates the essence of depravity, had always been the unquestioned law of this state. Interestingly, the New York Criminal Jury Instructions recognize the heightened mens rea standard by providing that "[c]onduct evincing a depraved indifference to human life creates a much more serious threat to human life than conduct which is merely reckless. * * * Under our law, a defendant acts with depraved indifference to human life when, in the judgment of the jury, his conduct, beyond being reckless, is so brutal, callous, dangerous and inhuman, so devoid of regard for human life, as to constitute *401 conduct equivalent in law to intentionally causing death" (2 CJI[NY] PL 125.25 [2], at 316-323 [emphasis added and in original] [internal quotation marks omitted]).
Notwithstanding this stringent standard, we have seen a proliferation of depraved indifference murder prosecutions at the trial level and a seemingly growing tolerance for them at the Appellate Division level.[12]

IV. The Statistical Increase in Depraved Indifference Murder Charges
After having been limited, for decades, to the most horrendous killings, depraved indifference murder counts have become routine escorts to intentional murder counts. While observers have sensed it and criminal lawyers on both sides of the fence would no doubt attest to it anecdotally, the statistics indisputably confirm it. According to the Division of Criminal Justice Services (DCJS),[13] in 1989 only 19% of all Penal Law § 125.25 indictments contained a count of depraved indifference murder. By 2001, prosecutors charged depraved indifference murder in 70% of all murder indictments. During that same period, while the number of murder indictments fell by 50% from 1315 to 666 per year, the number of depraved indifference murder charges nearly doubled from 246 to 468 annually (see Division of Criminal Justice Services, Indictment Statistical System, "New York State Indictments Containing at Least One Penal Law Section 125.25 Charge" [Feb. 2002] [reproduced in Appendix, infra]).
In addition to the seismic increase (in raw numbers) in depraved indifference murder prosecutions, DCJS has documented a burgeoning frequency of coupling depraved indifference murder counts with intentional murder counts. Between 1989 and 1992, prosecutors charged both counts for the same homicide an average of 221 times per year. Since 1993, prosecutors charged both counts an average of 373 times, a 69% *402 increase. Even more striking, as a percentage of all murder indictments, these twin-count indictments have steadily increased from 14% in 1989 to nearly 56% in 2001a fourfold increase in 13 years. Today, a majority of all murder indictments in New York charge both intentional murder and depraved indifference murder. This is extraordinary. Moreover, the rate of such twin-count indictments has steadily risen at an average rate of 4.3% each year for the last 13 years (see id.). There is no reason to doubt the continued expansion of this now routine practicehaving reached the point in which virtually every intentional murder is defined (inaptly, I submit) as an act of depraved indifference. The prediction that we would see a wholesale increase in the number of depraved indifference murder countsa warning dismissed by the Court in Register (and again in Roe)has come true.[14]
The majority's only response to this startling statistical phenomenon is to suggest that the number of convictions for depraved indifference murder has not risen as exponentially as the number of indictments (see majority op at 385 n 5). Even so, the charge of depraved indifference murder, intended to be a rare indictment for a rare breed of criminal, has undeniably become a tactical weapon of choice that distorts the Penal Law and skews the process of indictment, trial and pleajust as the dissenters in Register and Roe rightly predicted.

V. The Present Case
The facts are fully laid out by the majority and Judge Smith, revealing either an unprovoked shooting or a struggle culminating in a gun shot. Either way, there is not a semblance of depraved indifference murder as we have interpreted it or as the Legislature has defined it.
Undisputedly, defendant shot the gun directly at the victim's chest at point-blank range. When the defense objected to the trial court submitting depraved indifference murder to the jury, the court responded: "I think some people can conclude from the record that pointing a loaded gun at someone and pulling a trigger at point blank range within 18 inches is depraved, as well as intentional. So I am satisfied that the evidence will support the charge, so that's denied." This explication *403 of the law is simply wrong. It erroneously conflates intentional murder with depraved indifference murder. Moreover, it ignores entirely the level of uncommon mischief and inhumanity necessary to establish the depravity element in depraved indifference murder.[15]

A. Conflating Depraved Indifference Murder with Intentional Murder
The distinction between depraved indifference murder and intentional murder has been recognized as critical not only by our own Legislature and Practice Commentary authors but by other commentators. In their treatise, LaFave and Scott list types of conduct that various jurisdictions have held to be depraved: firing a bullet into a room of occupants; starting a fire at the front door of an occupied building; shooting into a moving train or automobile; throwing a beer glass at someone carrying a lighted oil lamp; playing "Russian roulette"; and shooting twice from eight feet away, not aiming at the victim, but with the bullets ricocheting in unpredictable directions after hitting hard surfaces (see 2 LaFave and Scott, Substantive Criminal Law § 7.4 [a], at 202-203 [footnotes omitted]). The authors go on to list other examples of extremely risky conduct such as piloting a speedboat through a group of swimmers or swooping an airplane so low over a traveling car as to risk decapitating a motorist (see id. at 203). These illustrations, which could constitute intentional murder given the proper mens rea, epitomize the depravity that we have insisted upon for 150 years in defining depraved indifference murder.
There is, however, a glaring omission from this list. The list does not (and cannot possibly) include intentionally shooting someone in the head (or, as here, in the chest) at point-blank range. The reason is simple: such an act should be prosecuted only as intentional murder under Penal Law § 125.25 (1). Indeed, if intentional murder qualifies as depraved indifference murder, there is nothing left of the depraved indifference murder statute. Any such killing would automatically be both intentional and depraved indifference murder. That result is not only illogical but also discordant both with our decisional *404 law and the statutory scheme's heightened requirements for depraved indifference murder. Moreover, it would equate homicides that should not be equated. The defendant who causes a person's death by opening a lion's cage, derailing a train or detonating a bomb in a public area should not be placed in the same classification as the defendant who uses a knife or a gun to kill an antagonist in a bar fight. Lumping these defendants together destroys the foundations of the depraved indifference murder statute and diminishes the severity of the most horrific killings for which the statute is reserved.[16]
The People nevertheless ask us to adopt the Trial Judge's erroneous formulation and endorse it as the law of this state. In their summation at trial, the People pressed the same theory they unwaveringly advanced from the inception of the case through this appeal: defendant intended to kill the victim. In arguing before the jury, the prosecutor elaborated in words that could not have been plainer or more emphatic: "defendant is guilty of intentional murder because when he shot the gun at [the decedent] * * * [h]e shot at his heart. You can intend no other result when you shoot a gun at someone's chest, other than to kill him and he did kill him, and that is why he is guilty of intentional murder" (emphasis added).
Echoing the Trial Judge, the People continue to argue that this very act of shooting the gun at the decedent's chest at point-blank range is so depraved (and evinces such indifference) that it qualifies as depraved indifference murder. Under the prosecutor's reasoning, the closer one points the gun to the chest (i.e., the closer one gets to intentional murder) the more indifferent is the actor. This formulation defines indifference and depravity by using intentionalityof all thingsas its measure. The more intentional the act, the argument goes, the more it reveals the defendant's depravity. We are afforded the ultimate incongruity when the prosecution argues that willfully aiming a bullet at the chest is necessarily the most depraved act of all. This reasoning illogically conflates depraved *405 indifference with intent, and the depraved indifference murder statute is nullified, utterly.
So too with the indifference component. The more the killer intends to kill the victim (the People's argument goes), the more indifferent the killer is to the victim's fate. But this obviously cannot be so. Intent to kill is a world apart from indifference. The two states of mind are incompatible and cannot be held simultaneously (see Gallagher, 69 NY2d at 529). The intentional murdererwho wants the victim dead and makes sure of itshould not be confused with the defendant who acts "come what may" and is indifferent to whether the victim lives or dies or is injured or even exists. The defendant who derails a train or poisons a well "come what may" has no specific intent to kill a particular person. Indeed, such defendants are totally indifferent as to whether their actions might or might not kill someone. It is their indifference to human lifenot their intent to take human lifethat marks them as the fittest candidates for depraved indifference murder convictions. Conversely, if the defendant poisoned the well knowing that the intended victim was about to drink from it, the act would amount to intentional murder, not depraved indifference murder. By arguing that all intentional murders are depraved because they are intentional, the People reveal the circularity of their position.
This misconception would not be evident to jurors because they are not acquainted with the Penal Law's gradations. When exhorted to do so, jurors may irresistibly (and understandably) be tempted to accept the notion that someone who aims a bullet at the victim's chest (or brain) is acting with depraved indifference to human life. Indeed, the DCJS statistics graphically reveal as much. Legally, however, the notion is all wrong because it thoroughly undoes the statutory scheme and obliterates the crucial distinction between depraved indifference and intentional murder.
In conversational terms, most people would have little difficulty in characterizing as depraved the behavior of someone who selects a victim, points a gun at that victim's head or chest and pulls the trigger. And yet we know that this act is and should be punishable not as depraved indifference murder but as intentional murder. Of course, we could call it depraved indifference murder, but we would have to scrap the Penal Law.
A finding of depravity in this fashion entails policy implications that are deeply troubling. Primarily, it makes it too easy *406 for prosecutors to seize upon depraved indifference murder as a fallback position whenever their proof for intentional murder fails to satisfy the jury. Resultingly, whenever there is insufficient evidence to make a case for intentional murder, the prosecution will inappropriately have a second chance at a murder conviction rather than one for manslaughter in the first degree under Penal Law § 125.20 (1).
Moreover, by diverting the jury to consider depraved indifference murder, trial courts (unwittingly, but palpably nonetheless) will mislead jurors into believing that depraved indifference murder is a milder charge readily available either when intentional murder has not been proved or as a means of extending a measure of leniency. The result is predictable: if and when a trial court in an intentional murder case erroneously authorizes a jury to consider depraved indifference murder, there is the very real possibility that the jury will improperly find the defendant guilty of depraved indifference murder. The jury cannot possibly realize the unfairness in it because they are not familiar with the refinements of the statutory scheme for homicides. They will go home believing (wrongly) that they convicted the defendant of a lesser grade of homicide. Furthermore, by diverting juries to consider depraved indifference murder, the People further enhance the probability of an unfair conviction because the depraved indifference murder statute does not permit an affirmative defense for extreme emotional distress (compare Penal Law § 125.25 [1] [a] with Penal Law § 125.25 [2]; see also Gegan, More Cases of Depraved Mind Murder: The Problem of Mens Rea, 64 St John's L Rev 429, 438-439 [1990]). Beyond that, there is the prospect of fallback prosecutions and overcharging as described by the dissent in Roe (see n 9, supra).[17]

B. Conflating Depraved Indifference Murder with Second Degree Manslaughter
To the extent that it endorses Register, the majority also conflates depraved indifference murder with reckless manslaughter. After today, depraved indifference murder can thus be used as a proxy for not one but two separate crimes.
In concluding that depraved indifference murder has a mens rea of ordinary recklessness, the Court in Register essentially *407 took the "depraved" out of depraved indifference, so that depraved indifference murder is virtually indistinguishable from reckless manslaughter. According to Register, depraved indifference murder and reckless manslaughter have the identical mens rea element of recklessness. The only difference between the two crimes lies in the so-called "objective circumstances" surrounding the criminal act. If the defendant's conduct created a "substantial" risk of death, the crime is second degree manslaughter. If, however, the defendant's conduct created a "grave" risk of death, the crime is depraved indifference murder (Register, 60 NY2d at 276-277).
Register conflates the two crimes not only by giving them the same mens rea, but also by seeking to differentiate them only in terms of "objective circumstances" that are all but indistinguishable. Thus, for the factfinder, everything turns on whether the defendant's conduct created a "grave" risk of death as opposed to a "substantial" risk of death. I think it is too much to ask of any juror. The difference between reckless manslaughter, which carries a minimum punishment of one year in prison, and depraved indifference murder, which carries a minimum punishment of 15 years in prison, should not turn on the razor-thin distinction between "substantial" and "grave."[18]
Indeed, the Register Court's formulation has the effect of treating defendants with the exact same mental culpability unequally by giving them vastly different sentences even though their moral culpability is identical. This consequence violates a fundamental principle of the criminal law, which seeks to punish defendants in proportion to the blameworthiness of their offense. A person who intentionally kills another is considered more culpable (and deserving of greater punishment) *408 than one who, through mere carelessness, causes the death of another. The Penal Law (as well as the Model Penal Code) recognizes this by creating different levels of culpability, with negligence being the least culpable and intentionality being the most culpable (see Penal Law § 15.05; Model Penal Code § 2.02).[19] If depraved indifference murder and reckless manslaughter have the same mens rea (i.e., ordinary recklessness), then two defendants with exactly the same mental culpability can be separately convicted of two different crimes (murder and reckless manslaughter) and receive vastly different punishments. As one harsh critic of Register has asked, "How can it be just to punish for murder, one offender whose mental culpability is no greater than that of another guilty only of manslaughterthereby exposing the former to an additional fifteen years of imprisonment?" (Gegan, More Cases of Depraved Mind Murder: The Problem of Mens Rea, 64 St John's L Rev at 435.)
Although the majority cites the Model Penal Code in support of its analysis, that reliance is misplaced. The Code reinforces the proposition that depraved indifference murder contains a different and much more culpable mens rea requirement than reckless manslaughter. This is clear for several reasons.
To begin with, the Code expressly provides that the "extreme indifference standard states a culpability requirement in addition to those used generally throughout the Model Code" (Model Penal Code, § 210.2, at 22 n 37 [emphasis added]). The culpability requirements "used generally throughout the Model Code" are negligence, recklessness, knowledge, and purpose (id. at § 2.02, at 22 n 37). By declaring that depraved indifference murder has a culpability requirement "in addition" to these four mental states, it follows inexorably that depraved indifference *409 murder does not have ordinary recklessness as its mental state. On the contrary, the Code repeatedly describes the requisite mental state for depraved indifference murder as extreme recklessness which "rises to the level of `extreme indifference to the value of human life'" (id. at § 210.2, at 25).[20] By stating that the recklessness must "rise" to another level, the Code leaves no doubt that depraved indifference murder has a graver (i.e., more substantial) mens rea element than reckless manslaughter. Indeed, in discussing the difference between the two crimes, the Code explains that "[o]rdinary recklessness [as defined by section 2.02 (2) (c)] is made sufficient for a conviction of manslaughter * * *. In a prosecution for murder, however, the Code calls for the further judgment whether the actor's conscious disregard of the risk, under the circumstances, manifests extreme indifference to the value of human life" (id. at 21 [emphasis added]).
Moreover, in discussing the role of the jury in a prosecution for depraved indifference murder, the Code cautions that a trial court should provide "instructions which make it clear that recklessness that can fairly be assimilated to purpose or knowledge should be treated as [depraved indifference] murder and that less extreme recklessness should be punished as manslaughter" (id. at 22 [emphasis added]). Given the Code's meticulous gradations of culpability into four neat categories (negligence, recklessness, knowledge and purpose), it is notable that the Code describes the requisite mens rea for reckless manslaughter as "less extreme recklessness" than the mens rea for depraved indifference murder. For the latter, the mens rea is closer to intent. As the Code Commentary notes, depraved indifference murder "reflects the judgment that there is a kind of reckless homicide that cannot fairly be distinguished in grading terms from homicides committed purposely or knowingly" (id. at 21 [emphasis added]). If depraved indifference murder had a mens rea of simple recklessness, the crime would be less blameworthy than intentional murder and would "fairly be distinguished in grading terms from homicides committed purposely or knowingly" (id.).
Second, the Code states that its formulation for depraved indifference murder "reflects both the common law and much *410 pre-existing statutory treatment usually cast in terms of conduct evidencing a `depraved heart regardless of human life' or some similar words" (id. at 22). This statement is revealing because under the common law, the crime's mens rea was marked by the defendant's "malignant heart" or "depraved mind." The mens rea was not (and except in the Register rationale has never been) ordinary recklessness. Indeed, even under New York's predecessor statutes to Penal Law § 125.25, the requisite mens rea was a "depraved mind" (Register, 60 NY2d at 277). Thus, by construing its depraved indifference murder provision in accord with the common law, the Code clearly contemplates that depraved indifference murder has a mens rea not of ordinary recklessness but of a depraved indifference that exceeds recklessness.
Third, the Code uses precisely the same examples of acts constituting depraved indifference murder as have been described elsewhere in this opinion and, indeed, as this Court itself described 150 years ago in Darry. The familiar examples cited by the Code are "shooting into a crowd or into an occupied house or automobile" (id. at 22). These illustrations epitomize a mental depravity and indifferent frame of mind considerably more heinous than mere recklessness.
The distinction between ordinary recklessness and depravity is important because it differentiates depraved indifference murder from manslaughter in the second degree (mere recklessness) and consigns depraved indifference murder to a very narrow class of inordinately horrific homicides. Indeed, the 1967 Commentaries to Penal Law § 125.25 highlight this distinction, emphasizing that the mens rea element of depraved indifference murder is extreme recklessness (see Denzer and McQuillan, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law § 125.25, at 235 [1967]).[21] It is this inhuman level of depravitythis "depraved kind of wantonness"that defines depraved indifference murder (see id.).
If we are to be faithful to the meaning and rationale of the depraved indifference murder statuteand thus require *411 extreme recklessness evincing depraved indifference as the mens reathe People's case must fail. Never did the People argue to the jury that defendant's conduct was reckless in any degree. They never deviated from their contention that defendant intended to kill the decedent. Accordingly, in my view, defendant's conviction for depraved indifference murder cannot stand.[22]

C. The Majority's Writing
In addressing the majority's writing, it is useful to discuss where we agree. Astutely, the Court recognizes the need to "differentiate[] between the reckless state of mind sufficient to establish the mental culpability of manslaughter and the extreme recklessness of murder under [the depraved indifference murder provision]" (majority op at 380 [emphasis added]). I agree entirely. I disagree with the majority's assertion, however, that Register recognizes this difference.
It is true, as the majority points out, that the Court in Register once used the phrase "egregiously reckless" (Register, 60 NY2d at 279). However, no court has ever interpreted these words, as today's majority does, to require a "significantly heightened recklessness" for depraved indifference murder (majority op at 380). Nor, I submit, did Register itself. Indeed, the Register Court plainly stated that "`recklessness' is the mens rea, and the only mens rea," for depraved indifference murder (Register, 60 NY2d at 278 [emphasis added]; see also id. at 277 ["recklessness is the element of mental culpability required"]). "Recklessness," the Court explained, merely "refers to defendant's conscious disregard of a substantial risk" (id. at *412 276). This definition, of course, is the one found in Penal Law § 15.05 (3), which defines ordinary recklessness.
The Register Court repeatedly emphasized that, in its view, the only element that elevates reckless manslaughter to depraved indifference murder is the entirely objective circumstance of whether the degree of risk created by the defendant's conduct is "grave" as opposed to "substantial" (see id. at 276-277). The majority now asserts that the degree of risk somehow elevates the defendant's culpable mental state to a "heightened recklessness" (majority op at 380). Register, however, did not say this. On the contrary, the Register Court expressly stated that "the depraved mind murder statute requires * * * not only that the conduct which results in death present a grave risk of death but that it also occur `[u]nder circumstances evincing a depraved indifference to human life.' This additional requirement refers to neither the mens rea nor the actus reus" (id. at 276 [emphasis added]).
Plainly, the Register Court refused (improperly, I submit) to consider depraved indifference as an element, and referred only to the "factual setting in which the risk creating conduct must occur[i.e., the] objective circumstances * * *" (id.). Accordingly, Register cannot be read to hold that the factual setting somehow elevates the requisite mens rea to a "heightened recklessness."
Register has stood steadfastly for the proposition that depraved indifference murder and reckless manslaughter contain the exact same mens rea: ordinary recklessness. This Court has made that same observation time and time again, expressly confirming that Register stands for that proposition. Six years after deciding Register, this Court said unequivocally: "The only culpable mental state required for murder under subdivision (2) of Penal Law § 125.25 (depraved indifference murder), we have made clear, is recklessness the same mental state required for manslaughter, second degree, under subdivision (1) of Penal Law § 125.15" (People v Roe, 74 NY2d 20, 24 [1989] [emphasis added]; see also People v McManus, 67 NY2d 541, 548 [1986] ["depraved indifference * * * involves the same mens rea" as reckless manslaughter]; People v Gomez, 65 NY2d 9, 11 [1985] [same]).
*413 The lower courts have similarly understood (and have uniformly applied) Register's holding that the two crimes share precisely the same mens rea of ordinary recklessness (see People v Shabaz, 173 AD2d 498, 499 [1991] [holding that depraved indifference murder has a mens rea of recklessness, "the same mental state required for manslaughter, second degree"]; People v Kalwasinski, 160 AD2d 732, 732 [1990] [holding that "(t)he only culpable mental state required for depraved indifference murder, * * * like reckless manslaughter, * * * is `recklessness'"]; People v Zebrowski, 198 AD2d 716, 718 [1993] [holding that, like reckless manslaughter, the mental state for depraved indifference murder is recklessness]; People v Moquin, 142 AD2d 347, 353 [1988] [holding that "the culpable mental state for both manslaughter in the second degree and murder in the second degree under Penal Law § 125.25 (2) is the same"]). Under any analysis, "objective circumstances" have nothing to do with the defendant's mental culpability and, contrary to the majority's contention, those circumstances cannot possibly "elevate[] and magnif[y] the degree of recklessness" (majority op at 381).
In my view, the majority's analysis is inapt because in defining the mens rea requirement of depraved indifference murder, it continues to focus almost entirely on the "objective circumstances" and improperly fails to recognize the defendant's depraved indifference to the value of human life as the central mens rea element. Nearly two centuries of decisional law and statutory enactments clearly require that to prove depraved indifference, the People must show far more than mere recklessness (i.e., mere disregard of a substantial risk). The defendant must evince a wicked and mischievous disregard (i.e., utter indifference) for the nearly certain consequences of his or her irresponsible act. It is this extreme wickednessthis abject moral deficiencythat, in the final analysis, places the defendant's culpability on an even plane with the intentional murderer.
In now recognizing a "heightened recklessness" standard for depraved indifference murder, the Court vitiates one of Register's principal thrusts. I applaud the majority for doing so because I think it is a step in the right direction. But it does not go far enough. The Register problem, and the unpalatable result which it has produced in this case, will never be alleviated until the logically inescapable final step is taken and depraved indifference is restored as the imperative mens rea.

*414 VI. The Remedy
There are four possible resolutions to this appeal based on a number of theories. The People seek affirmance; the majority affirms on a somewhat different theory; Judge Ciparick and defendant would reverse and dismiss; and Judge Smith and I would reduce the conviction to manslaughter in the second degree (Penal Law § 125.15 [1]). Having discussed both the People's arguments and the majority's grounds for affirmance, I think it important to consider the other possible resolutions.
Defendant claimsand Judges Ciparick, Smith and I agreethat a conviction for depraved indifference murder should be foreclosed. Judge Ciparick agrees with defendant, however, in his contention that because there is no evidence of recklessness, the conviction cannot be reduced to manslaughter in the second degree, and the case must therefore be dismissed. While I agree that the facts rule out a conviction for depraved indifference murder, a reduction to manslaughter in the second degree is appropriate.
Recklessness is, of course, lesser-included within depraved indifference murder. It is impossible for someone to be so reckless as to be guilty of depraved indifference murder, and not at the same time be "merely" reckless. On the facts before us, I am not prepared to say that defendant's conduct was in any way reckless. But that is not the end of the matter. Defendant himself agreed to a lesser-included instruction on manslaughter in the second degree, and the court charged it to the jury. Under these circumstances, defendant has waived any argument as to the insufficiency of proof as to recklessness and may not now be heard to say that he deserves an outright dismissal (see CPL 300.50 [1]; People v Ford, 62 NY2d 275, 283 [1984]; see also People v Richardson, 88 NY2d 1049, 1051 [1996]; People v Heath, 269 AD2d 701 [2000]; People v Dennis, 263 AD2d 618 [1999]; People v Green, 205 AD2d 637, 638 [1994]; People v Maldonado, 196 AD2d 778 [1993]).
The jury, after all, found that defendant engaged in highly culpable conduct. It is extremely unlikelyalmost inconceivablethat they would have acquitted defendant entirely if depraved indifference murder were taken out of the case. In all likelihood, they would have convicted defendant of manslaughter in the first degree (Penal Law § 125.20 [1]) or manslaughter in the second degree (Penal Law § 125.15 [1]). First degree manslaughter is inapt. Unlike second degree manslaughter, it *415 is not a lesser included offense of the crime for which defendant was found guilty. Manslaughter in the first degree is possible only if the case were to be remanded for a new trial on the theory that the jury was misdirected, and therefore had no opportunity to consider it the first time around. Such a remand, however, would raise serious double jeopardy questions (see CPL 40.20). Moreover, the possibility of a remand for a new trial for first degree manslaughter was not briefed in the appeal before us.
Reduction to second degree manslaughter is authorized by statute (see CPL 470.15 [2] [a]; 470.40 [1]; 470.20 [4]) and amply supported by decisional law (see People v Asaro, 182 AD2d 823, 824 [1992] [reducing the conviction from depraved indifference murder to reckless manslaughter where the defendant beat the victim with a baseball bat in a barroom brawl]; People v Magliato, 110 AD2d 266, 270-271 [1985], affd 68 NY2d 24 [1986] [reducing the conviction from depraved indifference murder to reckless manslaughter where the defendant shot the victim]; see also People v Thacker, 166 AD2d 102 [1991] [reducing the defendant's conviction from depraved indifference murder to reckless manslaughter]; People v Sika, 138 AD2d 935, 935, lv denied 72 NY2d 866 [1988] [same]; People v France, 57 AD2d 432 [1977] [same]; see generally People v Stewart, 40 NY2d 692, 699 [1976]). Even though I cannot say that defendant's conduct was reckless, I note that the majority concludes that it was. If we take that as a premise, a reduction to second degree manslaughter is appropriate because the additional component of depravity (which is necessary for a depraved indifference murder conviction) was not and could not have been proven. Concededly, there is something to be said for outright dismissal. Had defendant objected to the lesser included charge of reckless manslaughter, dismissal might well be warranted.
The Court, of course, has the power to overrule Register expressly and restore depraved indifference as the key mens rea element. This, I suggest, would be the appropriate way to remedy the logical bind that Register presents when pushed to its limits. Accordingly, I respectfully dissent.

*416
 Appendix
 New York State Murder Indictments: 1989-2001
 Indictments for Indictments for both
 depraved intentional murder
Indictmentm All murder indifference murder and depraved
year indictments (PL 125.25(2),[4]) indifference murder
 (PL 125.25)
 Number of Percent Number of Percent
 charges of murder charges of murder
 charges charges
 1989 1315 246 18.7 183 13.9
 1990 1463 358 24.5 252 17.2
 1991 1462 317 21.7 192 13.1
 1992 1900 360 25.7 258 18.4
 1993 1384 473 34.2 348 25.1
 1994 1214 514 42.3 428 35.3
 1995 1003 475 47.4 385 38.4
 1996 913 471 51.6 385 42.2
 1997 886 478 54.0 369 41.6
 1998 751 449 59.8 357 47.5
 1999 707 465 65.8 361 51.1
 2000 718 452 63.0 357 49.7
 2001 666 468 70.3 370 55.6
Notes: "Murder indictments" may include indictments for first degree
murder under Penal Law § 125.27. Figures available only since 1989
and 2001 figures are preliminary.
Data provided by: Division of Criminal Justice Services, Indictment
Statistical System (February 2002).

CIPARICK, J. (dissenting).
While I agree with my dissenting colleagues that the evidence presented at trial does not support a conviction for depraved indifference murder, and that after today the once prominent distinction between depraved indifference murder (Penal Law § 125.25 [2]) and intentional murder (Penal Law § 125.25 [1]) has been regrettably obscured, I disagree with their proposed disposition. Instead, I believe that no reasonable view of the evidence supports a finding of recklessness, on any level. This Court's only recourse is to reverse defendant's conviction of depraved indifference murder and dismiss that count of the indictment. I cannot concur with the dissent's recommendation to reduce defendant's sentence to manslaughter in the second degree (see Penal Law § 125.15 [1]).
*417 A reduction to second degree manslaughter proves problematic. The evidence supports a finding of intentional conduct, not recklessness (see Penal Law § 15.05 [1], [3]). Indeed, the sole eyewitness to the shooting, Ms. Liburd, claims that defendant "walked out [of the apartment] turned right back around and came in and drew the gun * * * and he shot Tim and he ran." The witness's description of the incident does not sustain a finding of reckless conduct but rather one of pure intent. Neither the objective circumstances necessary for a finding of depraved indifference murder, nor the basic recklessness necessary to sustain the lesser included count of manslaughter in the second degree are supported by the record.
Furthermore, defendant's acquiescence to a lesser included instruction on second degree manslaughter did not, in my opinion, operate as a waiver precluding him from raising an argument as to the insufficiency of the People's proof.
Order affirmed.
NOTES
[1] LaFave and Scott also agree with Register's holding that "drunkenness does not negative a depraved heart by blotting out consciousness of risk" (see id. at 205).
[2] The influence of this formulation in the Model Penal Code on the definition of reckless murder in Penal Law § 125.25 (2) has also been pointed out (see Model Penal Code § 210.2, Comment 4, at 26; 2 LaFave and Scott, Substantive Criminal Law § 7.4, at 201 & n 12).
[3] The Model Penal Code commentary expressly disclaims any mens rea requirement overlaying its standard of extreme recklessness. The defendant does not "need [to] be aware that his [or her] state of mind constitutes recklessness" (Model Penal Code § 210.2, Comment 4, at 22 n 37). That duplicative awareness was the position of the Register dissenters, which Judge Rosenblatt would have us adopt.
[4] It is also worth noting that while the Model Penal Code defines murder in its primary form as a homicide committed "purposely or knowingly" (Model Penal Code § 210.2 [1] [a]), we limit that form of murder to a homicide committed "[w]ith intent to cause the death" (Penal Law § 125.25 [1]). The Register majority formulation would cover such a homicide, even in the absence of proof of the existence of some other immoral mens rea.
[5] In this regard it is noteworthy that statistics for the same years as those cited in the appendix to Judge Rosenblatt's dissent do not support his contention that, "by diverting the jury to consider depraved indifference murder, trial courts * * * will mislead jurors into believing that depraved indifference murder is a milder charge readily available either when intentional murder has not been proved or as a means of extending a measure of leniency" (Rosenblatt, J., dissenting, 98 NY2d at 406). To the contrary, the statistical evidence establishes that the proportion of depraved indifference convictions has remained essentially stable, despite the increase in so-called depraved indifference "companion counts" in intentional murder cases (see Division of Criminal Justice Services, Indictment Statistical System, "NYS Indictments Containing PL 125.25 (1) and 125.25 (2) Counts (1989-2001)" [June 2002] [reproduced in Appendix]).

The number of indictments itself is not surprising. In 1990, the statute was changed to add a new category of depraved indifference murder of children. Also, at the presentation stage, the prosecutor may not have a developed theory of the case, and therefore might well seek both charges of intentional and depraved murder, which are narrowed at the time of trial.
[1] Revised Statutes of New York (part IV, ch I, tit I, §§ 4, 5 [2] [1829]) provided:

"§ 4. The killing of a human being, without the authority of law, by poison, shooting, stabbing, or any other means, or in any other manner, is either murder, manslaughter, or excusable or justifiable homicide, according to the facts and circumstances of each case.
"§ 5. Such killing, unless it be manslaughter, or excusable or justifiable homicide, as hereinafter provided, shall be murder in the following cases: * * *
"2. When perpetrated by any act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual."
[2] In 1854 (and before that), it was unruly horses; today, driving automobiles at high speeds into crowds (see e.g. People v Gomez, 65 NY2d 9 [1985]). The crime is the same.
[3] Former Penal Law § 1044 provided: "The killing of a human being, unless it is excusable or justifiable, is murder in the first degree, when committed * * * 2. By an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without a premeditated design to effect the death of any individual."
[4] The Penal Law (L 1965, ch 1030) became effective September 1, 1967. Section 125.25 (2) states that a person is guilty of murder when "[u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."
[5] See Temp St Commn on Revision of Penal Law and Criminal Code, Commn Staff Notes, Proposed NY Penal Law § 130.25 (1964).
[6] I agree with the majority that this circumstance (i.e., more than one victim) is not required under the present statute.
[7] See People v Lynch, 95 NY2d 243, 247 (2000) ("brutal and sustained"); People v Bryce, 88 NY2d 124, 126 (1996) (involving the killing of a sevenweek-old baby by fracturing his skull); People v Best, 85 NY2d 826 (1995), affg on op below 202 AD2d 1015 (1994) (involving the killing, by repeated beatings, of a nine-year-old child); People v Roe, 74 NY2d 20, 27 (1989) ("macabre game of chance" resulting in the victim's death); People v Gomez, 65 NY2d 9, 11 (1985) ("wanton indifference to human life or depravity of mind" where the defendant struck a child with his car, accelerated, and then struck and killed another child); People v Poplis, 30 NY2d 85, 88 (1972) ("continued brutality" in beating a three-year-old child); People v Rios, 230 AD2d 87, 88 (1997) ("brutal"); People v Gonsa, 220 AD2d 27, 29 (1996) ("brutal"); People v Tinning, 142 AD2d 402 (1988) (involving the smothering death of a three-month-old infant); People v Swartz, 130 AD2d 288 (1987) (involving the beating death of a two-year-old child); People v Brensic, 119 AD2d 281, 284 (1986), revd on evidentiary grounds 70 NY2d 9 (1987) ("brutal" killing by beating the victim and shoving rocks down his throat); People v Knapp, 113 AD2d 154, 164 (1985) ("barbaric"); People v Millson, 93 AD2d 899 (1983) (involving the beating death of a two-year-old child); People v McNeeley, 77 AD2d 205, 212-213 (1980) (involving the beating death of a two-year-old child); People v Lilly, 71 AD2d 393, 396 (1979) ("cruelty and hardness of heart").
[8] "Recklessly" is defined under Penal Law § 15.05 (3). That section provides: "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto."
[9] In dissent, and echoing the warning of the three dissenters in Register, Judge Bellacosa argued that by sustaining depraved indifference murder indictments against defendants whose actions were merely reckless, the Roe Court unduly expanded the scope of depraved indifference murder. "Prosecutors will find the temptation legally and strategically irresistible, and overcharging traditional reckless manslaughter conduct as the more serious murderous conduct will become standard operating procedure. * * * That devastating advantage, among others, given to the prosecution provides an unjust double opportunity for a top count murder conviction and an almost certain fallback for conviction on the lesser included crime of manslaughter" (Roe, 74 NY2d at 35-36). A review of the case law shows that after Register there was a substantial increase in depraved indifference murder charges (see n 14, infra). The dissenters' prediction in Register that the Court's decision would make it too easy for prosecutors to obtain murder convictions (see Register, 60 NY2d at 287) was reiterated by the dissenter six years later in Roe. The further increase in depraved indifference murder counts since Roe is striking (as shown by the figures cited at Part IV, infra) and illustrates the accuracy of the dissenters' predictions in both cases.
[10] See generally Donnino, New York Court of Appeals on Criminal Law § 35:28, at 35-21 through 35-29 (2d ed 1997).
[11] Reckless manslaughter is a class C felony (see Penal Law § 125.15 [1]) whereas intentional murder and depraved indifference murder are class A-I felonies (see Penal Law § 125.25 [1], [2]).
[12] See e.g. People v Lyons (280 AD2d 926 [2001] [affirming the depraved indifference murder conviction of a man who shot his lover's husband in the chest and head during a struggle]); People v Sawyer (274 AD2d 603, 607 [2000] [affirming the defendant's depraved indifference murder conviction where the "defendant deliberately thrust a steak knife into (the victim's) chest with significant force"]).
[13] We may properly take judicial notice of facts appearing in the public records of this State (see People ex rel. Nichols v Board of Canvassers, 129 NY 395, 420 [1891]; see also Matter of Siwek v Mahoney, 39 NY2d 159, 163 n 2 [1976] ["Data culled from public records is, of course, a proper subject of judicial notice"]).
[14] From People v Natal (102 AD2d 496 [1984]) to People v Crawford (295 AD2d 361 [2002]), the Appellate Divisions have considered over 100 convictions stemming from twin-count indictments, the vast majority in the last 10 years. I need not list them all.
[15] It is also wrong in suggesting that the act is at once both depraved and intentional. Under the law, it cannot simultaneously be both (see People v Gallagher, 69 NY2d 525, 529 [1987]). The trial court corrected this error only insofar as it allowed the jury to consider intentional murder and depraved indifference murder in the alternative. Depraved indifference murder should not have been charged at all.
[16] I am not suggesting that prosecutions for killings such as the one before us be the least bit relaxed. On the contrary, when a person shoots another in the chest at point-blank range, it deserves the most rigorous prosecutorial response. Defendant was appropriately charged with intentional murder and the question was put to the jury. The jury, however, acquitted defendant of that crime. They should have been directed to then consider manslaughter in the first degree. When a jury acquits a defendant of intentional murder, it should not be an automatic signal or invitation to consider depraved indifference murder as an alternative. In rare cases it would be proper; in most it would be unfair.
[17] Moreover, merely reciting an accusation of this kind to the jurywhen it does not belong in the caseexacerbates the unfairness of the practice. Indeed, the Supreme Judicial Court of Maine, in State v Lagasse (410 A2d 537, 540 [1980]), cautioned prosecutors on this point.
[18] Courts and commentators alike have severely criticized Register and its progeny (see Jones v Keane, US Dist Ct, SD NY, Brieant, J., 02 Civ 1804 [describing the Register Court's attempt to distinguish depraved indifference murder from reckless manslaughter as circular and unsuccessful]; Gegan, More Cases of Depraved Mind Murder: The Problem of Mens Rea, 64 St John's L Rev 429, 436 [opining that "(s)o tenuous is the [Register] court's rationale for refusing to recognize depraved indifference as a mens rea element, and so superfluous did its interpretation render the statutory language, that one can speculate that the court was simply reaching a desirable result on the precise issue before it: whether evidence of intoxication can negate the necessary mental element of depraved mind murder"]; 8 Zett, NY Crim Prac ¶ 69.2 [2] [c], at 69-37 [2002] [opining that "(i)f the distinction between that recklessness which will render the actor liable for manslaughter and that which will render him liable for murder is to be a meaningful one, the courts must strive and have sought to refine the tests necessary to make such a distinction"]).
[19] There is no reason why the list of mental states outlined in Penal Law § 15.05 should be considered exhaustive (i.e., should preclude a mens rea of "depraved indifference"). As one commentator notes, "While the legislature may reasonably be understood to gather into one place uniform definitions of standardized terms that can then be used throughout the rest of the statute, it is not sensible to suppose that the standardized terms necessarily suffice for the statement of all specific crimes. If the legislature wants to create some non-standard, culpable mental state ad hoc in a particular crime, it should not be hobbled in doing so. To interpret the definitional section in an exclusive manner converts it from a tool for the legislative drafter into his master" (Gegan, More Cases of Depraved Mind Murder: The Problem of Mens Rea, 64 St John's L Rev at 434). The Model Penal Code supports this argument. Although the Code has four culpable mental states, it expressly provides that the mental state for depraved indifference is "in addition" to those four (Model Penal Code, § 210.2, at 22 n 37).
[20] The Code emphasizes this point on several occasions, stating that the depraved indifference murder provision "includes within the murder category cases of homicide caused by extreme recklessness * * *" and also that "[w]hether recklessness is so extreme that it demonstrates similar indifference [as would a purposeful killing] is not a question, it is submitted, that can be further clarified" (Model Penal Code § 210.2, at 22 [emphasis added]).
[21] Although the language of the depraved indifference murder provision has changed slightly over time, the distinction between that crime and reckless manslaughter continues. Depraved indifference murder, unlike reckless manslaughter, contains the far more culpable mens rea requirement of depraved indifference. Indeed, section 125.25 (2) of the Penal Law is "substantially a restatement" of former Penal Law § 1044 (2)which, as the Register majority conceded, defined the requisite mens rea as "a depraved mind" (see Temp St Commn on Revision of Penal Law and Criminal Code, Commn Staff Notes, Proposed NY Penal Law § 130.25 [1964]).
[22] Register does not compel affirmance, even applying its ordinary recklessness standard which the majority seemingly disavows. Register concluded that the defendant committed depraved indifference murder by shooting three people in a "packed" barroom. Register had entered the bar with a loaded gun, saying he was "going to kill somebody tonight" (Register, 60 NY2d at 275). After having been told to put the gun away, he fired three times, killing one person and wounding two others. By having no particular victim in mind when he entered the bar and then shooting three people, Register's actions approximated the depravity of defendants like Jernatowski and others who fired multiple shots into a house knowing there were people inside. Here, defendant's actions did not evince (or even approach) the level of depravity or indifference contemplated by the statute or described in our case law.